# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MARY BARCHOCK, THOMAS WASECKO and STACY WELLER<br><br>Plaintiffs,<br><br>v.<br><br>CVS HEALTH CORPORATION, THE BENEFIT PLANS COMMITTEE OF CVS HEALTH CORPORATION, and GALLIARD CAPITAL MANAGEMENT, INC.<br><br>Defendants. | CIVIL ACTION NO.<br><br>CLASS ACTION COMPLAINT (ERISA) |

## I.   INTRODUCTION

1. Plaintiffs Mary Barchock, Thomas Wasecko and Stacy Weller bring this action under Income, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), on behalf of the 401(k) Plan and the Employee Stock Ownership Plan of CVS Health Corporation and Affiliated Companies (the "Plan"), and on behalf of participants in the Plan.  Plaintiffs sue for breaches of fiduciary duty and to obtain the relief provided under ERISA § 409, or other appropriate equitable relief under ERISA § 502(a)(3).

2. CVS Health Corporation ("CVS"); The Benefit Plans Committee of CVS Health Corporation ("Benefit Plans Committee"); and Galliard Capital Management, Inc. ("Galliard") (collectively, "Defendants") breached fiduciary duties owed by them to Plaintiffs and to the Plan by imprudently investing too much of the Plan's Stable Value Fund assets in short-term money market funds and cash management accounts that provided extremely low investment returns.

This breach occurred when Defendants knew or should have known that the Plan's Stable Value Fund assets should have been invested in securities that would have provided a significantly higher yield with no material additional investment, credit, or liquidity risk. It was a breach of Defendants' fiduciary duties to invest Plan assets so imprudently.  As a result, Defendants have caused Plaintiffs and the Plan to suffer substantial investment losses.

## II.     JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over Plaintiffs' claims under ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this action arises under the laws of the United States.

4. Venue is proper in the District of Rhode Island under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendants reside within or may be found in this District and/or the alleged breaches of the duties imposed by ERISA took place in this District.  Venue is also proper pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this District and/or a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this District.

## III.     PARTIES

5. CVS sponsors the Plan.  According to its most recent Form 10-K filed with the SEC, which was filed on February 9, 2016, CVS maintains its corporate headquarters at One CVS Drive in Woonsocket, Rhode Island, 02895.  On information and belief CVS can be served through its registered agent in the state of Rhode Island, CT Corporation System, which can be found at 450 Veterans Memorial Parkway, Suite 7A East Providence, Rhode Island, 02914.

6. The CVS Board of Directors designated the Benefit Plans Committee to be responsible for the overall administration of the Plan.  The Benefit Plans Committee appoints

investment managers for the Plan.  On information and belief, as an organ of the CVS Board of Directors the Benefit Plans Committee can be served through the registered agent of CVS described in paragraph 5.

7. The Benefit Plans Committee appointed Galliard to manage the Plan's Stable Value Fund.  Galliard selects the investments, investment managers, and insurance contracts for the Stable Value Fund, exercising discretionary authority over Plan assets, and is a fiduciary to the Plan.  Galliard reports receiving both direct and indirect compensation from the Plan for managing Plan assets in the Stable Value Fund.

8. At all relevant times, Plaintiffs Mary Barchock, Thomas Wasecko, and Stacy Weller were Plan participants.

- Ms. Barchok resides in Lakeport, Michigan.  She allocated portions of her retirement investments in the Plan to the Stable Value Fund.
- Mr. Wasecko resides in Jamul, California.  He allocated approximately 90% of his retirement investments in the Plan to the Stable Value Fund.
- Ms. Weller resides in Dallastown, Pennsylvania.  She allocated portions of her retirement investments in the Plan to the Stable Value Fund and to the Conservative and Moderate Lifestyle Funds which allocate assets to the Stable Value Fund.

### IV.    THE PLAN

9. With the recent significant decline in the number of traditional pension plans, 401(k) plans have become the principal source of retirement savings for American workers.  The Plan at issue here gives workers the opportunity to invest in a range of between one and sixteen investment options, including the Stable Value Fund.

10. As of December 31, 2014, three of the investment options offered by the Plan were so-called "lifestyle" funds: the Conservative Lifestyle, the Moderate Lifestyle, and the Aggressive Lifestyle Funds. These Lifestyle Funds are asset allocation funds. Asset allocation funds invest in underlying funds designed to create a particular investment mix that is consistent with a level of risk and return, as implied by the name of each fund. Each of the Lifestyle Funds achieves its designated level of risk by allocating its assets among the other available Plan investment options in varying percentages. The Aggressive Lifestyle Fund is designed for younger participants farther away from retirement who can wait out the downside of market cycles and have a higher risk tolerance than an investor who is older and closer to retirement. The Aggressive Lifestyle Fund allocates most of its assets among the investment choices that invest in equities and less to those choices that invest in fixed income securities. The Aggressive Lifestyle Fund does not allocate assets to the Stable Value Fund. The Moderate and Conservative Lifestyle Funds allocate a portion of their assets to the Stable Value Fund.

11. At all relevant times, the Plan was an employee pension benefit plan within the meaning of ERISA § 3(2)(A) and an individual account plan within the meaning of ERISA § 3(34).

### V. STABLE VALUE FUNDS IN GENERAL

12. The "character and aims" of stable value funds are well defined. By way of example, according to the trade association for the stable value industry, the Stable Value Investment Association ("SVIA"), a stable value fund should be invested in a high-quality, diversified, fixed-income portfolio that is designed to preserve capital while providing steady positive returns.

13. Stable value funds are an essential investment alternative for 401(k) plans for at least two important reasons. First, equity markets have historically been more volatile than the bond markets; stable value funds provide retirement plan participants the ability to move out of equity investments during periods of high market volatility into stable investments that protect participants' principal while offering a moderate rate of interest. Second, stable value funds give retirees, who cannot "ride out" the down periods in a market cycle, the ability to protect the value of their retirement savings and earn a reasonable rate of interest. This is especially important as investors near retirement age.

14. Stable value funds invest in longer-term securities than money market funds; accordingly, they are expected to provide a significantly higher return than money market funds. Typically, investments with a longer duration have returns higher than investments with a shorter duration.

## VI.   THE STABLE VALUE FUND IN THE PLAN

15. The Stable Value Fund in the Plan is one of the designated investment options in which Plan participants may invest their retirement savings. The audited financial statement attached to the Plan's 2013 Annual Return on Form 5500 (Annual Return") describes the Stable Value Fund:

> **Stable Value Fund**
> This fund is managed by Galliard Capital Management and seeks to preserve capital while generating a steady rate of return ***higher than money market funds provide***. The fund's investments consist of cash, highly rated insurance company contracts (guaranteed investment contracts ("GICs")), other bond investments, and a commingled fund managed by Galliard Capital Management that is further diversified by manager and security type.[1]

---

[1] 2013 401(k) Annual Return, Financial Statements and Supplemental Schedules, at p. 9. (emphasis added).

16. Notwithstanding that clear differentiation between stable value funds and money market funds, the Defendants inexplicably invested huge percentages of the Stable Value Fund's assets in the EB Temporary Investment Fund offered by the Bank of New York Mellon ("BONY").

17. As described by BONY, the assets of the EB Temporary Investment Fund are invested primarily in short-term debt obligations of the U.S. Government, short-term corporate obligations, certificates of deposit, demand deposits, and other short-term debt obligations. The maximum average maturity of the EB Temporary Investment Fund is 60 days. The average adjusted duration of investments held by the EB Temporary Trust Investment Fund as of June 30, 2015 was just 0.10 years.

18. The EB Temporary Investment Fund is a short-term cash management account. The 2013 Annual Return for the EB Temporary Investment Fund shows assets at the beginning of the year of $19.15 billion and assets at the end of the year of $22.17 billion. It also shows transfers into the fund of $653.4 billion and transfers out of $650.4 billion. The incredible cash flow of the EB Temporary Investment Fund shows it is used by prudent investors as a very short term investment option. The rate of return for the EB Temporary Investment Fund is also very low. This is another indicator that the fund is used by prudent investors as a very short term investment option.

19. In 2010, Defendants allocated $542 million out of $985 million of total Stable Value Fund assets in the Plan to the EB Temporary Investment Fund. ***This means Defendants parked more than half of all the Plan's assets in the Stable Value Fund in a very short term and low yield investment.*** Defendants' failure thus to prudently invest the Plan's assets simply is indefensible. Defendants may as well have left the Plan's assets in a checking account.

20.     In 2010, the EB Temporary Investment Fund earned $33.4 million on average assets of $11.6 billion, or provided a 0.28% return (28 basis points).  In stark contrast, the Stable Value Fund invested its other assets in insurance contracts that provided guaranteed rates of return of more than 5%.  This makes it obvious that other investments were available to the Stable Value Fund that yielded significantly higher interest rates.

21.     As of December 31, 2011, the allocation to the EB Temporary Investment Fund was $434 million out of $991 million in total Stable Value Fund assets – 44% of the total Stable Value Fund investments.  For 2011, the EB Temporary Investment Fund reported earnings of $31.5 million on average assets of $15.7 billion, or 0.2% (20 basis points).  In 2011, the insurance contracts in which other Stable Value Fund assets were invested were paying 5%.  Again, Defendants' prudent investment of Stable Value Fund assets in higher yielding insurance contracts stands in stark contrast to the abysmally imprudent investment return obtained by investing 44% of Stable Value Fund assets in the EB Temporary Investment Fund.

22.     As of December 31, 2012 the allocation to the EB Temporary Investment Fund was $462 million out of $960 million in total Stable Value Fund assets – 48% of the total.  The EB Temporary Investment Fund reported earnings of $43.5 million on average assets of $17.35 billion, or 0.25% (25 basis points).  The operative insurance contracts for the investment of other Stable Value Fund assets were paying 5% in 2012.

23.     The first significant drop in the allocation of Stable Value Fund assets to the EB Temporary Investment Fund occurred during 2013 when the allocation declined to $280 million but still a healthy 27% of the total $1.036 billion in Stable Value Fund assets.  For 2013, the EB Temporary Investment Fund reported total income of $35 million on average assets of $20.66

billion, or 0.17%. In 2013, the average interest rate being paid by the Stable Value Fund insurance contracts was 1.24%.

24. These numbers are significant when considered in the context of savings for retirement over a career. Underperformance of a plan's investment choices, and/or the charging of excessive fees can have a cataclysmic effect on the accumulation of an individual's retirement savings. A difference of only 30 basis points is significant in this regard. Consider an investment of $1000 over 30 years that earns 6.5%. This investment would have grown to nearly $6,600. If the same investment only earned 6.2%, the final value would only be $6,050, or 8% less. An 8% difference translates into one full extra monthly payment each year (1/12 = 8%). It is the difference, to a participant, of receiving 12 payments per year or 11 payments. A 30 basis point lower return eliminates an entire month of retirement income when a participant is living off accumulated retirement savings.

25. Measuring the lost earnings resulting from this indefensibly excessive retirement investment allocation to cash even against the return of other assets in the Stable Value Fund indicates that since 2010, the imprudent allocation of Stable Value Fund assets to the EB Temporary Investment Fund cost Plaintiffs and the proposed Class more than $70 million in lost earnings.

## VII. DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

26. ERISA defines a fiduciary as anyone who exercises authority or control over the management or disposition of plan assets. 29 U.S.C. § 1002(21)(a).

27. Defendants are ERISA fiduciaries for the Plan, Plan participants and beneficiaries.

28.     ERISA § 404(a)(1) requires that a plan fiduciary discharge its duties with respect to a plan solely in the interest of plan participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

29.     The U.S. Department of Labor ("DOL") and case law confirm this duty. To comply with the duty of prudence, a fiduciary must give "appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role that the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties." 29 C.F.R. § 2550.404a-1(b)(1). "Appropriate consideration," according to DOL regulations, includes but is not limited to: "(i)[a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or whether applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and (ii) [c]onsideration of the following factors …: (A) [t]he composition of the portfolio with regard to diversification, (B) [t]he liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and (c) [t]he projected return of the portfolio relative to the funding objectives of the plan." 29 C.F.R. § 2550.404a-1(b)(2).

30.  A fiduciary's investment services are evaluated under ERISA "in light of the character and aims of the particular type of plan he serves." *In re Unisys Savings Plan Litig.*, 74 F.3d at 435 (emphasis added and quotation omitted). The "character and aims" of stable value funds are well defined both by ERISA regulations and industry practice.

31.  Defendants' conduct with respect to the Stable Value Fund violates their fiduciary duties to act solely in the interests of Plan participants and to act prudently under the goals of stable value investing.

32.  Galliard failed to exercise prudence in its investment strategy for the Stable Value Fund by causing the Stable Value Fund to invest in securities with extremely low yields and low durations compared to what should be expected from prudently managed stable value fund investments.

33.  Despite the continued poor performance of the Stable Value Fund, CVS and the Benefit Plans Committee took no action to cause Galliard to change, improve, or correct its imprudent investment conduct. This failure to monitor and supervise Galliard after years of underperformance provides an independent basis for liability under ERISA. *See Tibble v. Edison International*, __ U.S. __, 135 S. Ct. 1823, 1828 (2015). CVS and the Benefit Plans Committee utterly failed in their obligation to monitor the performance of Galliard and failed to take any reasonable action to correct the allocation of such high percentages of Stable Value Fund assets to such low-performing investments over a period of years.

## VIII.   CLASS ACTION ALLEGATIONS

34.  Plaintiffs bring this action as a class action under Rules 23(a) and 23(b)(1) or, in the alternative, 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the class of similarly situated persons ("the Class"):

>All participants in the Plan who invested in the Stable Value Fund and/or who were invested in the Moderate Lifestyle Fund and/or the Conservative Lifestyle Fund from six years before the filing of this action until the time of trial (the "Class Period").

35.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown and can only be ascertained through discovery, Plan documents indicate there were over 140,000 Plan participants who may have elected to invest a portion of their retirement savings in the Stable Value Fund which held more than $1 billion in assets and represented nearly 14% of all Plan assets.  Plaintiffs believe there are, at a minimum, tens of thousands of members of the Class given the size of the Stable Value Fund.

36.     Common questions of law and fact exist as to all members of the Class and predominate over questions solely affecting individual members of the Class.  Among such questions are:

>(a) Whether Defendants are fiduciaries to the Plan;

>(c) Whether Defendants breached their fiduciary duties with respect to the investment of Stable Value Fund assets; and

>(d) Whether Defendants' alleged breaches of fiduciary duty caused losses to Class members and, if so, in what amount.

37.     There are no substantial individual questions among the Class claims on the merits of this action.

38.     Plaintiffs' claims are typical of the claims of the members of the Class, as Plaintiffs and the Class were harmed by Galliard's wrongful conduct regarding the Stable Value Fund.

39. Plaintiffs have been injured by the breaches of fiduciary duty alleged and are committed to fairly, adequately, and vigorously representing and protecting the interests of the members of the Class.

40. Plaintiffs have retained counsel competent and experienced in class action litigation of this nature for this purpose.

41. Neither Plaintiffs nor their counsel have any interests that might cause them to refrain from vigorously pursuing the claims in this action. Plaintiffs are adequate representatives of the class.

42. Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the Defendants, and/or because adjudications regarding individual Class members would as a practical matter be dispositive of the interests of non-party Class members.

43. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because common issues of law and fact predominate over questions affecting only individual members of the Class. The only individualized issues will be the amount of damage each member of the Class incurred from the Stable Value Fund's underperformance, and such damages can be readily calculated based on business records maintained by the Defendants.

44. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Defendants injured Plaintiffs and Class members by diminishing their investment returns. This diminution of returns is, on an individual level, small and difficult to detect but in the aggregate is enormous. Individual participants who have

invested in the Stable Value Fund have an insufficient stake in the outcome of this matter to devote substantial resources to pursue it.

45.  On information and belief, the names and addresses of Class members are available from the Defendants and/or the Plan.  Adequate notice can easily be provided to members of the Class to the extent required by Fed. R. Civ. P. 23.

### IX. REMEDIES FOR VIOLATIONS OF ERISA

46.  ERISA § 502(a)(2) provides that a civil action for breach of fiduciary duty for relief under ERISA § 409 may be brought by a participant, beneficiary, or fiduciary of a plan.

47.  ERISA § 409 requires "any person who is a fiduciary who breaches any of the duties imposed upon fiduciaries to make good to such plan any losses to the plan." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate," which is actionable under ERISA § 502(a)(3).

48.  Plaintiffs here are Plan participants and may therefore bring suit on behalf of the Plan seeking relief from the Defendants in the form of:

   a.  A monetary payment to restore Class members the loss of benefits resulting from the breaches of fiduciary duties as provided by ERISA §§ 409(a) and 502(a)(2);

   b.  Injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(3);

   c.  Reasonable attorneys' fees and expenses, as provided by ERISA § 502(g), the common fund doctrine, and other applicable law;

   d.  Taxable costs and interest on these amounts, as provided by law; and such other legal and equitable relief as may be just and proper; and

   e.  Such other legal or equitable relief as may be just and proper.

49.  Under ERISA, Defendants are jointly and severally liable.

## X.    CLAIMS FOR RELIEF

### COUNT ONE – GALLIARD'S BREACH OF FIDUCIARY DUTY

50. The Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth in this Count One.

51. A fiduciary's investment decisions are evaluated under ERISA "in light of the character and aims of the particular type of plan he serves." *In re Unisys Savings Plan Litig.*, 74 F.3d at 435 (quotation omitted). The "character and aims" of stable value funds are well defined both by ERISA regulations and industry practice.

52. Defendant Galliard failed to exercise prudence in its investment strategy for the Stable Value Fund and caused the Stable Value Fund to invest in and/or approved the Stable Value Fund's investments in securities with low yields and extremely short durations compared to what should be expected from prudent stable value fund investments.

53. Defendant's breaches caused the Stable Value Fund to provide returns substantially and consistently less than other prudently managed stable value funds subject to the same economic conditions and risk parameters.

54. ERISA § 409 provides any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary.

55. ERISA § 502(a)(2), permits a plan participant to sue for relief under ERISA § 409.

56. ERISA § 502(a)(3), permits a plan participant to sue to obtain appropriate equitable relief to enforce Title I of ERISA or to enforce the terms of a plan.

57. Galliard's imprudent actions caused the Plaintiffs and Class members to incur losses from diminution of investment returns and Galliard is liable for such losses.

58. Under ERISA §§ 409 and 502(a), the Defendants are personally liable to make good to Plaintiffs and Class members the losses they experienced because of the Defendants' breaches of fiduciary duty.

59. Under ERISA § 502(a)(3), the Court should also award equitable relief to Plaintiffs and Class members.

## COUNT TWO – CVS AND THE CVS BENEFIT PLANS COMMITTEE'S BREACH OF FIDUCIARY DUTY

60. The Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth in this Count Two.

61. Under ERISA, a fiduciary has a continuing duty to monitor investments and remove imprudent ones from the menu of plan investment options. This continuing duty exists separate and apart from the duty to exercise prudence in selecting investments at the outset.

62. CVS and the Benefit Plans Committee failed continuously to monitor investments. The continued poor performance of the Stable Value Fund would have caused a reasonable prudent trustee to question why the Stable Value Fund was performing so poorly. A reasonably prudent trustee would have immediately discovered that the reason for the poor performance was because unreasonably high percentage of the Stable Value Fund assets were invested in cash management and similar accounts that produced abysmal investment returns. It was imprudent to have so much of the Stable Value Fund's assets invested in cash management accounts. Neither CVS nor the Benefit Plans Committee took any action to cause Galliard to

change its investment strategies.  Because of the failure of CVS and the Benefit Plans Committee to perform their obligations under ERISA, Plaintiffs and Class members have suffered losses for which CVS and the Benefit Plans Committee are liable.

63. Under ERISA §§ 409, 502(a)(2) and 502(a)(3), CVS and the Benefit Plans Committee are liable to make good to the Plaintiffs and Class members the damages sustained by them.

64. Under ERISA § 502(a)(3), the Court should also award equitable relief to the Plaintiffs and Class members.

## XI.   PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for judgment as follows:

A. A determination that this action may be maintained as a class action under Federal Rule of Civil Procedure 23, and appointing the Plaintiffs as class representatives;

B. A Declaration that the Defendants breached ERISA fiduciary duties owed to the Plaintiff and Class members;

C. An Order compelling the Defendants to Plaintiffs and Class members all losses resulting from the Defendants' breaches of fiduciary duty;

D. An Order awarding damages to the Plaintiffs and Class members, with interest as provided by law;

E. An Order enjoining the Defendants from any further violations of their ERISA fiduciary obligations;

F. An Order awarding costs under 29 U.S.C. § 1132(g);

G. An Order awarding attorneys' fees under 29 U.S.C. § 1132(g) or as provided by law;

      H.      An Order for equitable restitution and other appropriate equitable and injunctive relief against Defendants; and

      I.      Granting such other and further relief as the Court may deem just and proper.

Dated: February 11, 2016                Respectfully submitted,

/s/ Sonja L Deyoe
_____
Sonja L. Deyoe, RI Bar No. 6301
Law Offices of Sonja L. Deyoe
395 Smith Street
Providence, RI 02908
Telephone: (401) 864-5877
Facsimile: (401) 354-7464
sld@the-straight-shooter.com

Garrett W. Wotkyns, AZ Bar No. 025887* (to be admitted *pro hac vice*)
John N. Nestico, CT Bar No. 102718* (to be admitted *pro hac vice*)
**SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP**
8501 North Scottsdale Road, Suite 270
Scottsdale, Arizona 85253
Telephone: (480) 428-0142
Facsimile: (866) 505-8036
gwotkyns@schneiderwallace.com
jnestico@schneiderwallace.com

Kyle G. Bates, CA Bar No. 299114* (to be admitted *pro hac vice*)
**SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP**
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: 415-421-7100
Facsimile: (415) 421-7105
kbates@schneiderwallace.com